**BIGSTAR ENTERTAINMENT, INC., Plaintiff,**

**v.**

**NEXT BIG STAR, INC., Next Big Star L.L.C., Victory Entertainment Corporation and Michael H. Gerber, Defendants.**

No. 00 Civ. 0911 VM.

United States District Court,
S.D. New York.

April 17, 2000.

Jeffrey A. Conciatori, Lisa T. Simpson, Orrick, Herrington & Sutcliffe, L.L.P., New York, NY, for Plaintiff.

Steven J. Stein, Kay, Collier et ano., New York, NY, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

BigStar Entertainment, Inc. ("BigStar"), plaintiff in this action for a preliminary injunction, seeks to restrain Next Big Star, Inc. and related defendants (collectively, "Next Big Star") from using a name that plaintiff contends infringes on BigStar's prior trademark rights. BigStar's business for over two years has been principally the sale of videos, offered along with

free information about the film industry, chat rooms and interviews with movie celebrities, all conducted online through the World Wide Web at "www.bigstar.com". Next Big Star was launched recently to conduct an entertainment talent search. For this purpose, defendants established a website at "www.nextbigstar.com" through which they plan to conduct their talent contest and offer related information, chat rooms and interviews with celebrities.

The case, typical of many trademark disputes, reaches to the fringes of the subtleties that very often enter into what is in a name and manifests the weighty consequences associated with the choice. The parties' legal quarrels here, and the issues they raise, are familiar. But the controversy adds the dimension of cyberspace. It joins the ranks of the exponential number of legal struggles arising out of the use of the Internet—as a mass medium of communication and commerce, and, more and more prolific as consumers and markets expand and competing users clash, as an incubator of lawsuits. Many among this rapidly growing variety of cases raise knotty issues, some of them novel. Do these online collisions pose new, unique difficulties to the law? To what extent do the distinct dimensions of the World Wide Web challenge the established concepts and methods developed to resolve legal conflicts arising from other media? Do the familiar approaches suffice to accommodate analysis of unaccustomed aspects of the new disputes? The case before the Court prompts some of these questions, aspects of which have not been fully addressed in this Circuit.

The Court, having reviewed the parties' papers raising some of these issues, and having heard oral argument, sets forth its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons described below, this Court has concluded that BigStar, though first in time as between these parties to stake out its name,

trademark and web domain, has not met the legal burden to establish it is entitled to enjoin Next Big Star at this stage of these proceedings.

## I. FINDINGS OF FACT [1]

The facts before this Court are undisputed. The parties' disagreement is limited to the application of relevant legal standards to these facts.

BigStar, a Delaware corporation with an office in New York, has its principal address in cyberspace at "www.bigstar.com". There it operates as an online retailer dedicated exclusively to filmed entertainment products such as videocassettes, digital video discs ("DVDs") and related movie merchandise. Plaintiff's website also provides its visitors with movie industry news, interviews with celebrities, movie previews and periodic online chats in real time with film celebrities.

Plaintiff has used variations of its name as trademarks and in a logo to identify its "Movie Superstore" on the Internet since its incorporation in March 1998 and has used and advertised its name and domain address since the launching of its website in May of 1998. Its website logo contains the words "bigstar.com" and appears in black ("bigstar") and red (".com"). A five-pointed red star is used to dot the "i", and a light bluish-grey trail evinces that the star has streaked across the top of the logo to the left from the right.

Plaintiff filed applications for trademark registration protection with the Patent and Trademark Office ("PTO") in October 1998 for "BIGSTAR" and in May 1999 for "BIGSTAR.COM". These applications remain pending. While no opposition to them has been filed to date, at least two parties, including defendants herein, have requested additional time from the PTO within which to consider whether to file a Notice of Opposition to plaintiff's marks. Plaintiff states it has spent over $12 mil-

---

**1.** The facts, as described herein, are gleaned from the various submissions to this Court

and from the February 22, 2000 hearing before the Court.

lion to date on marketing BigStar's name and products, by virtue of which it contends its trademarks have become well known and established in the market in which they operate. According to plaintiff, it received over 3 million unique visits to its website in January 2000.

In December 1999, BigStar formed an alliance with Value Vision International Inc. ("Value Vision") and announced a venture into the offline world, where it hopes to produce a weekly television program for Value Vision's cable network. BigStar's show, to be called "THE BIGSTAR SHOW" will consist of human interest stories about film celebrities and their movies and will offer plaintiff's merchandise for sale. Plaintiff has also filed with the PTO an application to register "THE BIGSTAR SHOW" in connection with its television production.

Defendants Next Big Star, Inc. and Next Big Star L.L.C. are corporations organized in December 1999 and January 2000, respectively, under the laws of the state of Delaware. Both entities are involved with defendant Victory Entertainment Corporation, a multimedia company incorporated in Florida, in the development, sponsorship and production of an online talent competition to be conducted and judged on the Internet and of a related network television program to be produced quarterly in order to introduce the competition winners. Defendant Michael H. Gerber is a New York resident who serves as president and chief executive officer of Victory Entertainment Corporation, and as senior executive of the other corporate defendants. Mr. Gerber assisted with the creation of the "Next Big Star" mark [2] and the implementation of the talent search venture.

The defendants, in or about October 1999, approached Ed McMahon, a televi-sion personality who was previously associated with The Tonight Show and who had hosted a talent competition on national television called Star Search, in an attempt to enlist him in their enterprise. Mr. McMahon joined forces with the defendants and, from November 1999 through January 2000, helped them design the contest, television show and website.

On January 25, 2000, defendants issued a press release promoting their new online talent competition and related television program and the launching of "www.nextbigstar.com" as the site for the competition. Defendants claim that their website received 4.75 million "hits" in the weeks immediately following the announcement of their venture.

Defendants' logo, which was revised shortly after this litigation commenced as a direct result of plaintiff's instant application, now contains the words "ED McMAHON'S nextbigstar.com", the first half of which appears in white or red ("ED McMAHON'S"), with the other words in yellow ("nextbigstar" and "com"). It, too, has a five point red star, but here the star replaces the period in ".com", above which there is a long triangular red mark designed to resemble the upward beam of a searchlight.

Defendants' website celebrity interviews, along with the information there provided, are intended primarily to promote the talent search and encourage participation. Defendants are also sponsoring a national bus tour to search for talent and, to this end, were scheduled to start visiting some 40 cities in March 2000. Persons interested in entering the competition, whether enlisted by promotion online or through the bus tour, may select the category that best fits their skills from the many choices offered by defendants,

2. The Court notes that defendants more frequently refer to their one trademark as "Next Big Star". *See* Affidavit of Michael H. Gerber, sworn to February 17, 2000 ("Gerber Aff."), ¶ 1; Memorandum of Law in Opposition to Plaintiff's Application for a Preliminary Injunction ("Defendants' Memorandum") at 2. Defendants, however, also refer to the same mark as "NEXT BIG STAR". *See* Declaration of Michael H. Gerber, dated February 18, 2000 ("Gerber Decl."), ¶ 2. The Court, therefore, uses the former phrase to refer to defendants' mark and television show.

such as music, comedy, dance and modeling. The aspiring performer is invited to complete and sign an entry form which may be copied from the website and submitted to defendants, along with a registration fee of $19.95 and a self-produced videotaped performance.

Performances are to be displayed on the Internet for judging by individuals at home who may download, view and vote on them. Under defendants' plan, the online contest winners are to appear on a nationally televised competition to be broadcast four times a year on a major network. The television contest, which is to be called "The Next Big Star Show", is to be hosted by Mr. McMahon and will be simulcast on the World Wide Web. Performers who reach the television competition are eligible to win cash awards up to $10,000.00 and other prizes.

Plaintiff, upon learning of defendants' plans as announced on January 25, 2000, moved on February 7, 2000 for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to restrain defendants from (a) using "Next Big Star" or "nextbigstar.com" as a trademark, trade name, Internet domain name or as part of a logo in connection with their new online talent competition or related television program and (b) taking any other actions designed or intended to infringe and dilute the value of plaintiff's trademarks, logo and domain name. This Court heard oral argument on February 22, 2000.

## II. CONCLUSIONS OF LAW

A preliminary injunction is an extraordinary equitable remedy which places on the movant the burden of proving each element requisite for such relief. The decision to grant a preliminary injunction rests within the sound discretion of the Court. To obtain a preliminary injunction in this Circuit, the moving party must show (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party request-ing the preliminary relief. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). We now consider whether plaintiff has met its burden, addressing the second requirement first for reasons later explained.

### A. Likelihood Of Plaintiff's Success On The Merits

A preliminary injunction may issue only if the Court finds that the movant is likely to prevail on the merits of the underlying controversy. The movant need not show that success is certain, only that the probability of prevailing is "better than fifty percent." *Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). Plaintiff's complaint sets forth five claims, each of which we address in turn.

#### (1) *Trademark Infringement Claim Under § 43(a) of the Lanham Act*

Neither plaintiff's "BIGSTAR" nor "BIGSTAR.COM" is a registered trademark. Although plaintiff has filed for registration, its applications are still pending. Nonetheless, unregistered marks may qualify for protection under section 43(a) of the Lanham Act, which provides in pertinent part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

The Second Circuit has noted that "eligibility for and scope of protection under section 43(a) ... is dependent on the nature of the mark allegedly infringed...." *Western Publ'g Co., Inc. v. Rose Art Indus., Inc.,* 910 F.2d 57, 60 (2d Cir.

1990). As in any case under section 43(a), once the strength of plaintiff's marks is identified, the focus turns to whether defendants' commercial name or symbol is likely to cause confusion among consumers as to the source, origin or sponsorship of plaintiff's goods due to any similarity between the respective marks.

The likelihood of confusion as to a product's source is evaluated by balancing the eight factors set forth in Judge Friendly's seminal opinion in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In considering plaintiff's claim here, this Court thus must examine the

> function of many variables: the strength of [its] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant[s'] good faith in adopting its own mark, the quality of defendant[s'] product, and the sophistication of the buyers.

*Id.* at 495. No single one of these factors is determinative, and this Court may consider additional factors if appropriate. *Id.*

### (1) Strength of Plaintiff's Marks

Plaintiff must establish that its trademarks fall within one of the classes of marks recognized as eligible for protection under section 43(a) of the Lanham Act. In order to determine whether plaintiff's marks are entitled to protection, the Court must initially classify the marks by looking to their strength, bearing in mind that the purpose of trademark law is to establish the rights of the creators and users of commercial names, while also protecting the general public from confusion, mistake or deception that may flow from the copying of a mark which, through distinctiveness, identifies the origin of the products so branded. *See W.E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 871 (2d Cir.1966).

A mark's strength is measured by two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993) (citing *McGregor–Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131–33 (2d Cir.1979)). And this is where the word battles here begin. The parties sharply disagree on the strength of plaintiff's trademarks. BigStar contends that its marks are inherently distinctive and should be classified as arbitrary or fanciful, or at least as suggestive. Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction ("Plaintiff's Memorandum") at 11. Next Big Star argues that BigStar's marks are generic or descriptive, or perhaps "at *most*" suggestive. Defendants' Memorandum at 6–8. Each of these designations carries distinct rank with legal implications on which the case may turn. What label the law pins on the marks can make all the difference.

What goes into a product name or symbol is often charged with nuances. Precisely for this reason, trademark law abounds with elaborate semantics and fine distinctions that test the limits of parsing the language, rendering judgments among competing claimants in disputes about commercial marks always an exacting and perplexing challenge. "Razor-thin judgment calls are indigenous to the law of trademark protection." *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 212 (2d Cir.1985). Through the rambles and tangles of words, and through the niceties and bewilderment peculiar to this area of the law, however, certain order and logic and purposes do emerge, even if at times only impressionistically. These points of light help illuminate the ends that the law strives to achieve, as well as the priorities it recognizes and protects. The challenge entailed in resolving the conflicting claims at issue in this case may be eased somewhat if the analysis of the decision to be made is formulated against a backdrop of the theory and intent of the law in this area, on the conceptual framework and accompanying legal principles upon which

trademark and unfair competition rules are founded.

A close reading of pertinent cases, statutes and commentary suggests some of the basic ends trademark law seeks to achieve and the values it strives to promote and protect. Most prominent among these are to encourage honest business competition and to recognize and reward commercial creativity, investment, diligence, initiative and good faith, weighed against certain interests of the public, when making purchasing choices, to be protected from confusion, mistake and deception. As the discussion below indicates, the rank the law assigns to a name or mark chosen for use in trade, along with the accompanying level of protection, varies in direct proportion to the presence of these equities. Implicitly, if not expressly articulated, the probability of inherent distinctiveness injected into a choice of a commercial name and the foreseeability of its exclusivity also bear significantly in establishing the scope of recognition and protection to which a trademark is eligible.

Language is rich, and English more bountiful than most in this regard. The wealth of our tongue consists of an almost limitless number of words, alone or in combination, placed at our disposal to name persons, places and things. And when the known nomenclature falls short, when the existing or familiar vocabulary just will not do to serve a purpose calling for a special term, only the frontiers of human ingenuity contain the possibilities to adapt a common word to an uncommon use, to borrow one from a foreign language or to invent one altogether for the given need perceived. Moreover, together with the name, the graphic logos designed to identify products and link them to their source further enlarge the range of signature possibilities to still more expansive dimensions.

And yet, the law abounds with conflicts about names given to things. For, from among the abundance of opportunities available, the selection of a term or symbol used to describe an article in trade is fraught with legal meaning, often also with potentially fateful consequences. To this end, the options that language aided by imagination offers are vast, ranging from the mundane to the sublime, from the known, clear and familiar to the abstract, the allusive, the symbolic, the figurative, the fancied or entirely improvised. Within that broad compass, trademark choices generally follow patterns that fall within a spectrum of two extremes.

At a far end, one approach strives deliberately for uniqueness and inherent distinction. It does so by purposefully employing rare or coined terms or using ordinary words in unusual ways. This choice may be grounded on several objectives. It recognizes that the more effort, creativity and resources invested to produce and establish the name or mark, the greater the probabilities are that another person, honestly and truly, genuinely by happenstance, will not chance upon identical or similar words to brand a comparable product in the same or near market. That farther reach extended to tap imagination works to extract what is farther out of range and to protect against the odds of duplication. It thus may not only serve the purpose of diminishing the likelihood of infringement, but may also guard against the prospect that the public may confuse the item or its source with another one. And, should the name sufficiently stir the fancy of customers for which the product is intended, the considered choice of the unconventional way, like the propitious tide in human affairs, may lead on to fortune. It could reap rewards for the rightful holder of the mark. If the trademark catches on, if by its ingenuity or singularity it captures the imagination and embeds in the mind of the public, it could firmly establish the distinctiveness of the article and others similarly named by the same producer, thereby advancing the identity and markets of the source. In this manner, the originality summoned to give the product its name may generate its own recompense.

Uniqueness and distinctive identity, however, have their limitations. Inventiveness does not spontaneously spawn recognition. Nor does it necessarily create a following for any given goods. Public acceptance and allegiance must be purchased, at a price generally proportionate to the degree of novelty of the trademark and product and the unfamiliarity of their origin. Accordingly, however inspired and felicitous the mark may be, it takes a greater investment of capital, energy and time, as well as higher-stake risk, to establish a market in a product sold under a brand that identifies neither the article, the market nor the source. And, once achieved, success inevitably invites parasitic imitation or outright copying. Good fortune attracts piracy to the fruits of creativity.

The course at the other end of the spectrum lessens some of these obstacles and risks. It offers the somewhat easier and quicker way to product recognition and source identity. This shortcut entails a choice of the road most taken by entrepreneurs searching for trademarks and names. It is that of using names that rely on common terms, on marks that display little linguistic flair or frills, nothing fancy that demands stirring an associational flight into imagination either on the part of the creator or the purchaser of the goods so named. By sticking with the familiar and employing self-advertising, ordinary description, these marks readily identify the item sold or its market and maker. A product whose name hawks what it is sells itself. Because the trademark rides on the coattails of the product itself, or easily identifies the seller and what is being sold, relatively less time and investment generally may be necessary to create a loyal market for the goods.

But the commonplace, too, has its inherent deficiencies. And here the laws of probability and foreseeability come into play to yield reverse results. Where the distinctive trademark route might lead to fortune, remarkably the beaten path more often taken may end at the intersection with the law's equivalent of the road to the poorhouse—potential litigation. Reliance on conventional, pervasive terms to label a product reduces the likelihood that consumers would be confused by products similarly named in a competing market. This result obtains in part because the undistinguished name raises the probability of chance duplication, rendering it both more likely and foreseeable that another person, acting entirely independently and in good faith, may strike upon the same word or notion to brand a potentially competing product in a potentially competing market. As the chances of foreseeable, honest trademark duplication rises, the element of surprise to consumers and to merchants, as well as their realistic expectation about the singularity and distinctiveness of the trademark in question, should lessen. In this manner, therefore, the business judgment to settle on the familiar term entails its own risk-benefit calculus. The easy mark may offer the less costly, more rapid course to name recognition and identification of source. At the same time, the name selection entails an assumption of risk in two ways. First, in settling upon ordinary words the likelihood of duplication is greater. Second, the law places a heavier burden on trade reliance on the common term by extending less recognition and protection to inherently indistinctive marks precisely because of the probability that the public is less likely to be confused by them.

Trademark law, as it has evolved in the cases and as codified in statutes, recognizes the whole spectrum of these distinctions, not only at the lines demarcating the two extremes, but in the very subtle shades of differences that blend faintly in between. The law distinguishes among these bands and their ends, applies corresponding legal concepts and assigns varying consequences. Thus, it confers degrees of recognition, and it bestows differing levels of protection—thereby fostering competition, initiative, investment and diligence—in a hierarchical scale that weighs these considerations in the mix. And, for the reasons indicat-

ed, it rates the trademark, and ranks the order of protection to which it is entitled, in proportion to the inherent qualities the mark reflects in minimizing the likelihood of confusion, mistake and deception in the marketplace. In this respect, the law tilts decidedly in favor of the distinctive term over the unremarkable, the rare over the commonplace.

These concepts were concisely articulated by the Second Circuit in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976). There the Court identified and examined four classes of marks generally recognized in commercial use, "[a]rrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded...." *Id.* at 9. The categories are (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Id.* But, as *Abercrombie & Fitch Co.* recognized, much ambiguity and complexity inhere in these classifications "because a term that is in one category for a particular product may be in quite a different one for another, because a term may shift from one category to another in light of differences in usage through time, because a term may have one meaning to one group of users and a different one to others, and because the same term may be put to different uses with respect to a single product." *Id.* The word puzzles and legal quandaries these amorphous intricacies pose are concretely illustrated by the example cited by a leading trademark commentator who, declaring that the proper designation of a mark will vary with the relationship between the term and the product or service, opined that "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:71, at 11–120 (4th ed.1999).

The generic label attaches to words that comprise the ordinary language. It embraces terms which derive from nomenclature that has become the public domain and which are employed to identify a particular thing by its given name. Such terms cannot be appropriated or monopolized. Generic words and their usage belong to all who wish to speak the language. No single user may corner the market on application of particular terms of everyday speech to serve private purposes, to the exclusion of other persons who may seek, at the risk of potential liability to one who laid claim to words of common currency, to avail themselves of ordinary language to refer to an article by its publicly accepted name. *See American Cyanamid Corp. v. Connaught Lab., Inc.,* 800 F.2d 306 (2d Cir.1986). For these reasons, the common law did not extend validity or protection to trademarks based on generic terms, regardless of how far the use of the name may have prospered in marketing a particular product and publicly associating it with its maker. Indeed, if an invented word becomes too successful over time, it may very well be deemed generic and lose its protection. *See, e.g., King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 321 F.2d 577 (2d Cir.1963) ("THERMOS"); *Dupont Cellophane Co. v. Waxed Products Co., Inc.,* 85 F.2d 75 (2d Cir.), *cert. denied,* 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936) ("CELLOPHANE"); *Bayer Co., Inc. v. United Drug Co.,* 272 F. 505 (S.D.N.Y.1921) ("ASPIRIN"); *Haughton Elevator Co. v. Seeberger,* 85 U.S.P.Q. 80 (1950) ("ESCALATOR"). Thus, Kentucky Fried Chicken could not usurp the words marking its product and thereby deprive "Kansas Fried Chicken" of the use of common language to describe its own brand of the same thing, compelling the later entrant into strained construction of language for generic reference to the identical product, such as "Kansas Fowl Cooked in Deep Fat".

Could BigDeal Investments, having commenced trade under that mark, fore-

close Next Big Deal Prospectors from using the words their names have in common? The answer, approaching closer to the merits of the dispute at hand, turns on the status accorded to marks filling the next ring in the order: those labeled as descriptive. Names in this grouping also rely on generic words that contain literal descriptions. These terms, with minor shades and twists, readily identify the qualities or content of the item and signal the market in which the product may be found. *See, e.g., PaperCutter, Inc. v. Fay's Drug Co., Inc.,* 900 F.2d 558 (2d Cir.1990) ("PAPER CUTTER" paper ornaments); *W.E. Bassett Co.,* 354 F.2d 868 ("TRIM" cuticle trimmer); *Ideal World Mktg., Inc. v. Duracell, Inc.,* 15 F.Supp.2d 239, 244 (E.D.N.Y.1998), *aff'd,* 182 F.3d 900, 1999 WL 464978 (2d Cir.1999) ("POWERCHECK" battery). Because the mark, by incorporating familiar words that manifestly refer to the goods or market, piggybacks on the product itself, a merely descriptive term is considered a weak mark.

The protection threshold of the descriptive name is placed above that of the generic, to which neither the common law nor the Lanham Act affords trademark protection, but the range is restricted. First, the scope of protection may be narrowly limited to similar goods and markets in close competitive proximity. *See* 3A Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 20.43, at 472 (4th ed.1999); *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 350 (9th Cir.1979). Second, to be eligible for legal recognition and enforcement, the descriptive name must satisfy a standard particular to this classification. While section 2(f) of the Lanham Act (*see* 15 U.S.C. § 1052(f)) permits registration of merely descriptive terms, the corresponding protection it accords demands, as a precondition, proof that the mark has acquired secondary meaning in its market. This test refers to demonstrable evidence that the mark, by means of sufficient marketing, sales, usage and passage of time, has established distinctiveness in commerce, measured by the extent to which it has become identified in the public mind with the particular source of the goods.

Suggestive marks occupy the next gradation on the scale of trademark status and protection. This variety is perhaps the most elusive, the hardest to conceptualize and define. Like generic and descriptive names, this category relies on terms derived from ordinary language. But the words chosen for a suggestive name are not just any words, but specially select words, the *mot juste* appointed for the particular trade purpose. Such terms generally do not, unlike the merely descriptive phrase, direct the consumer immediately to the producer by way of road signs that prominently advertise the goods. Instead, the journey to the market source leads there through an intermediate loop at a cloverleaf in thought. Where the descriptive common word leads the buyer by the hand, the rarer suggestive mark ushers through the mind. From the commercial name to the product or its market to its source, the suggestive term transports both through purposefully evocative words laden with intimation and through the contemplated imagery and associations the name conjures. That passage is neither linear nor strait. It demands a mental exercise, multiple bounds in a dual act of perception and imagination. A first stage is associated with the creative energy exerted by the maker of the mark. When choosing what to call the article, the creator of the suggestive name meaningfully fixes upon associational terms that will identify the product figuratively and will appeal to the consumer by allusion and metaphor. The second mental act closes that loop. It is that which occurs in the mind of the consumer allured to the product, and who may accept it in part on the strength of the purposeful imagery summoned by its name.

Among the prominent qualities the courts have found most compelling for a mark to qualify as suggestive are the extent to which the mark demands or reflects creativity; abstract thought and

intuition; allegorical reference; metaphorical resemblance; figurative imagery; associational reasoning; and sheer incongruity—in short, the ingenuity that inspired the following graphically apt word-product associations declared suggestive: "ROACH MOTEL" (insect trap);[3] "GUNG–HO" (military toy figure);[4] "COPPERTONE" (suntan lotion);[5] "PLAYBOY" (magazine);[6] "POP-CORN" (small silver anodes used in electroplating);[7] and "SHEER ELEGANCE" (pantyhose).[8] By these standards, suggestiveness is an artful quality of inherent imagery and obliqueness infused into a fine turn of a word or phrase which, at the moment of perception when it all clicks and the association intended becomes apparent, stirs the response, often with admiration: "That's it." It is, for example, the roundabout recognition evoked by calling a computer clicker a "mouse", or conceiving of the name "Big Star" to mark a small inn in Bethlehem.

■ One court in this District defined the difference: "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968). Qualitatively, the distinction may be illustrated by the difference in the creativity which must be summoned to devise, as well as the sequential thought necessary to catch the linkage meant by, a name such as "PASSION" for a fragrance on the one hand (*see Elizabeth Taylor Cosmetics Co., Inc.*

*v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238 (S.D.N.Y.1987)) and, on the other, "LITTLE TAVERN" for a restaurant. *See Little Tavern Shops v. Davis* 116 F.2d 903 (4th Cir.1941). Correspondingly, it is likely to demand greater effort and larger financial investment in order to create the public recognition associating the suggestive mark with its product and establishing a market linking the item to its source. Recognizing the larger commitment of both resourcefulness and resources that must be spent to procure market success with a given suggestive term, the law rewards the extra demands by conferring broader trademark protection upon this class than that granted to the merely descriptive term. The suggestive name does not depend upon a showing of secondary meaning to entitle it to trademark registration. *See Abercrombie & Fitch Co.,* 537 F.2d at 8.

■ At the apex of the trademark hierarchy are the terms denominated arbitrary or fanciful. In this realm, inventiveness and ingenuity leap beyond mere suggestiveness, dispensing with any effort to identify the product through its name. That continuity, even through circuitous routes, is entirely broken. Arbitrary marks employ common words in uncommon ways. New fanciful words and terms are not real words at all, but are coined and applied in a unique, unfamiliar usage for the express purpose of serving as a trademark to be attached to a particular product, but bearing no identifying trace to the product or source. Of course, that gap is not forever. In time, with sufficient advertising, the unfamiliarity of the fanciful or arbitrary use may be overcome, at

**3.** *American Home Products Corp. v. Johnson Chemical Co., Inc.*, 589 F.2d 103 (2d Cir. 1978).

**4.** *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir.1988).

**5.** *Douglas Lab. Corp. v. Copper Tan, Inc.*, 210 F.Supp. 453 (2d Cir.), *cert. denied*, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954).

**6.** *Playboy Enterprises, Inc. v. Chuckleberry Publ'g, Inc.*, 486 F.Supp. 414 (S.D.N.Y.1980), *aff'd*, 687 F.2d 563 (2d Cir.1982).

**7.** *RFE Indus., Inc. v. SPM Corp.*, 105 F.3d 923 (4th Cir.), *cert. denied*, 521 U.S. 1120, 117 S.Ct. 2512, 138 L.Ed.2d 1015 (1997).

**8.** *No Nonsense Fashions, Inc. v. Consolidated Foods Corp.*, 226 U.S.P.Q. 502 (Trademark Tr. & App. Bd.1985).

some threshold of marketing success creating a risk that the term may take on generic usage in some markets, there applied to refer to the particular product. *See Abercrombie & Fitch Co.*, 537 F.2d at 9. By way of contrast, for example, while some stretch of imagination may be needed to link "PASSION" to a perfume, it demands much more, especially at the initiation of the mark, to establish an association between "APPLE" as a brand name for a computer or "XEROX" for a copier.

Given its uppermost tier, the fanciful or arbitrary name is the easiest to register and, like the suggestive, does not demand proof of secondary meaning. In according to this class the highest rank of trademark recognition and protection, the law recognizes that the more unique and inherently distinctive the mark, the stronger it is, and the greater will be the likelihood that the public may confuse a similar mark in the same or closely related market as originating from the same source. *See* 3A Callmann, *supra*, § 20.43, at 47. *See also Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir.1987). The law also acknowledges and rewards the yet greater level of creativeness, investment and risk required to establish and sustain a market in a product so denominated, recognizing, among other things, that the act of inherently distinct creation also builds in a form of self-protection. The unfamiliar or coined term significantly enhances the likelihood of exclusivity. It guards against infringement, presumptively easing enforcement by minimizing the odds that a competitor would independently, and in good faith, arrive at the same or a substantially similar arbitrary or fanciful mark.

■ These legal distinctions have all been put into play in the case before the Court. Application of the principles described to the proper classification of the names here in dispute should facilitate resolution.

### Inherent and Marketplace Distinction

#### Classification of the Marks

As an initial matter, the Court notes that PTO registration is pertinent to a mark's strength. Plaintiff's marks herein are not registered (Affidavit of David S. Friedensohn sworn to February 4, 2000 ("Friedensohn Aff."), ¶ 9), and third parties have sought additional time from the PTO within which to consider whether to oppose plaintiff's pending applications for registration. Affidavit of Lance H. Koonce, III, sworn to February 17, 2000 ("Koonce Aff."), Ex. A. Accordingly, the Court is unable to draw upon the legal presumptions about the validity and classification of a mark that follow from an incontestable registration. This analysis therefore must commence on a clean slate.

We begin with plaintiff's choice of words for its trademarks, assessed in the context of the markets in which the products exist and how the terms used may reasonably be perceived by the ordinary consumer to whom the claimant appeals. The Court disagrees with BigStar's claims that its marks are inherently distinctive and finds instead that plaintiff's marks fit more properly in the trademark grouping designated as descriptive.

In reaching this judgment, the Court grants, at the outset, that the call is a narrow one, by no means devoid of doubt. Hence, the Court has taken pains here, at lengths perhaps excessive, to explain the grounds upon which its conclusion rests and the paths that lead the Court there. The choice is difficult for the same reasons which, over the ages, have bedeviled many other judges in marking the vague boundary that divides suggestive and descriptive terms. Courts and commentators alike concede that the border is often "chimerical" (*Thompson Med. Co., Inc.*, 753 F.2d at 215, n. 8) and "illusory." *Id.* at 215. The gradations between the two classes often blend imperceptibly into one another, resulting in often confusing, at times subjective and even contradictory decisions. *See*

*Abercrombie & Fitch Co.*, 537 F.2d 4; *Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc.*, 297 F. 247 (S.D.N.Y. 1923), *aff'd*, 4 F.2d 1018 (2d Cir.1925). *See also* 2 McCarthy, *supra*, at § 11:71, at 11–118. In a sense, most marks may possess qualities that properly may be called both suggestive and descriptive. Description may be suggestive, and suggestion may be descriptive, and one may evolve into the other. A compound word or a composite phrase may combine components of both. Whatever the difficulties encountered in finding them, the demarcations are real. As Justice Holmes said, "the theory of the law is that such lines exist." Oliver Wendell Holmes, *Law in Science and Science in Law*, 12 Harvard L.J. 443, 457 (1899).

In rejecting BigStar's contention that its marks are arbitrary or suggestive, the Court considered a number of questions culled from case law and commentary. How are BigStar's marks perceived? How are the words composing the name understood by the ordinary potential customer in the market in which plaintiff offers its products? To what degree do the marks challenge the imagination of the general public or the targeted ordinary consumer? How rapid, demanding and direct is the thought process by which the prospective buyer of plaintiff's products will associate them with their source? Does that connection require mature, multi-step reasoning? Or does "BIGSTAR" or "BIGSTAR.COM" as used in the commercial context here promptly convey an immediate idea of the qualities or characteristics of the goods? How likely is it that consumers would be confused by the appearance of a "BIG STAR" or "Big Star" in the same industry? Does the name rely on plain words that are in the public domain? Would exclusive trade use of those words by one person reduce the stock of common terms, infringing on the rest of the public's use of the language? Would the first user's claim to protected use of the common words unduly restrict the competitive opportunity of other entrants into the same or similar market to the equal use of ordinary language to describe another product, potentially competing or not, or to refer to it by its commonly understood name? What were the probabilities of duplication of the name at the time conceived and chosen by plaintiff, and how foreseeable was the likelihood of a competing name occurring in the same market?

In light of these considerations, BigStar's arguments that it created an arbitrary or suggestive name "that would serve to distinguish its business from those of others similarly situated either on the web or off the web" (Transcript from February 22, 2000 District Court Hearing ("Tr.") at 6) fail on several grounds. First, plaintiff's marks patently fall short of the recognized features of arbitrary or suggestive marks. The Court does not find anything rare or inventive about the plain words comprising "BIGSTAR". Nor are they suggestive as used in reference to products offered in the entertainment industry. In that context, the terms do not leave much to the imagination. In this Court's view, no subtlety or intimation, no mental detour or thought gymnastics are demanded to span by creative leap the small space evident here between the product and name and its source. Simply put, the terms do not convey the attributes by which other courts have recognized the inherent distinctiveness of suggestive marks. In ordinary English usage, the simple phrase "big star" so arrayed and contemplated as a reference to film celebrities and entertainment, conveys something qualitatively different from suggestiveness. It calls up nothing but the thing itself. *See Aluminum Fabricating Co. of Pittsburgh v. Season–All Window Corp.*, 259 F.2d 314, 316 (2d Cir.1958) (Season–All used to refer to storm windows held to contain a quality of fancy sufficient to justify trademark registration. "Had they been used in reverse order the result 'All–Season' would seem to be merely descriptive. . . . ").

Second, by contrast, plaintiff's trademark vehicle and its destination are both rather literal, and their route quite direct. The words "big" and "star" are common

terms used in everyday speech. Their combination does not, ipso facto, create an inherently distinctive mark. *See Lang v. Retirement Living Publ'g Co., Inc.,* 949 F.2d 576, 581 (2d Cir.1991). In its dictionary meaning, as in most ordinary public understanding, the phrase "big star" readily connotes either a large celestial body luminous at night, or a renowned or preeminent performer, particularly in motion pictures or plays. Consequently, applied to brand merchandise offered in either the astronomy or the entertainment industries, it would require minimal or no mental effort for any ordinary, reasonably informed member of the general public, as a natural, or even first association, to correlate "big star" with a description of products or services in those markets. In these commercial contexts, "big star" as a trademark is neither unexpected nor remarkable. The term, through its literal, accepted usage, refers to the qualities, ingredients or other characteristics of the product and, without any intermediate mental loops, beams straight to the source.

Third, more narrowly orienting the inquiry to the entertainment industry, the ordinary, reasonably informed consumer to whom plaintiff targets its film products, "which showcase current and past celebrities" (Plaintiff's Memorandum at 17), is likely to understand the plain words in a "BIGSTAR" trademark by their common definition and "forthwith" associate them with the qualities of goods related to entertainment such as those BigStar offers. The Internet users who visit plaintiff's website and see references there to BigStar's self-identification as the "Movie Superstore" (Friedensohn Aff., Exs. A, B), and the viewers who may tune in to BigStar's contemplated "THE BIGSTAR SHOW" and watch productions featuring stories about film celebrities and their movies, could not come away with an impression about plaintiff's marks other than that they immediately describe products in the motion picture industry.

Fourth, plaintiff has affirmatively selected an arrangement of words whose literal meaning describes plaintiff's primary products and their characteristics. The terms may be interpreted to be used either as adjective and noun, therefore naming the merchandise itself, or adjectivally as a phrase to describe the kind of film entertainment products plaintiff offers, that is, videos and information about "Big" stars of the movie industry, in contradistinction to "little" stars, or amateurs (more in line with defendants' business), or as opposed to products relating primarily to prominent figures of other fields, such as the actual giants of sports, of science, or of politics, philosophy or religion (except as these may be portrayed by movie stars or in documentaries produced by the entertainment industry). It is clear from the record here that plaintiff's use of the words in the mark "BIGSTAR" and the effect its names create are intended not only to convey "forthwith" the idea that the goods plaintiff sells relate primarily to the stars of the film industry, but also to escort the purchaser immediately to the seller, BigStar Entertainment. These are the very hallmarks on which courts have relied to denominate merely descriptive terms.[9]

9. Examples include "INVESTACORP" investment broker-dealer (*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.,* 931 F.2d 1519 (11th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991)); "COZY WARM ENERGY SAVERS" pajamas (*20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 747 F.2d 81 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985)); "RICH LIGHTS" cigarettes (*Philip Morris Inc. v. Brown & Williamson Tobacco Corp.,* 230 U.S.P.Q. 172 (T.T.A.B. 1986)); and "SUPER BLEND" superior blend of motor oil (*Quaker State Oil Ref. Corp. v. Quaker Oil Corp.,* 59 C.C.P.A. 764, 453 F.2d 1296 (C.C.P.A.1972)). Other examples are "SNAKE LIGHT" flexible light (*Black & Decker Corp. v. Dunsford,* 944 F.Supp. 220 (S.D.N.Y.1996)); "NO SPOT" car wash system (*Raco Car Wash Systems, Inc. v. Smith,* 730 F.Supp. 695 (D.S.C.1989), *appeal dismissed,* 929 F.2d 694, 1991 WL 43225 (4th Cir.1991)); "KING SIZE" clothing for large men (*King–Size, Inc. v. Frank's King Size Clothes, Inc.,* 547 F.Supp. 1138 (S.D.Tex. 1982); "WORLD BOOK" encyclopedia (*Field

Fifth, the probability of duplication of words not particularly unique such as "big star" in entertainment is high, as illustrated by the number of other businesses using the same words as marks for commerce. Indeed, that the two words would occur to anyone searching for a product name in a film-related industry is almost reflexive. For any entity in that industry, it requires no burst of inspiration or imagination to compose a name using "big star" or to strike upon some other close adaptation of the words. It is also highly foreseeable that another person entering the same market, or a different niche of it, may settle on the same choice entirely unaware of the existence of prior claimants. That these two words reside in the public domain increases the element of predictability of some good faith recurrence or resemblance of the name, and diminishes the first user's reasonable expectation of exclusivity and the likelihood of surprise. Correspondingly, pervasiveness of use of a term lessens the possibility that an ordinary, reasonably informed purchaser would be confused into believing that two marks, obviously varied and applied in different corners of a market, actually derive from a particular single source. *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir.1993).

Sixth, the phrase "big star", comprised of ordinary words only borrowed or adapted rather than created, belongs in the public domain and cannot be appropriated to merchandise exclusively the products of one particular seller. Other potential entrants share an interest in using such words in connection with the advertisement and sale of goods and should not be foreclosed from using descriptive terms to label their products. *See Thompson Med. Co., Inc.*, 753 F.2d at 216. This principle comes significantly into play under the facts of this case. BigStar, by adapting ordinary words which in plaintiff's trade context can only be understood in their common meaning to refer to past and living "big stars" of the film industry, seeks to preclude defendants from using the same ordinary sense of the common words to describe not the big stars of yesterday or today that are primarily the subject of plaintiff's enterprise, but the "next" big stars, those of tomorrow whom the name of defendants' talent search proclaims.

Under plaintiff's fanciful/suggestive theory of its marks, a market entrant wishing to call its product "Big Stars" and whose business is devoted to information, interviews and sales, offered online through a website at "www.bigstars.com", of products related solely to great sports or opera "stars" could not, without risking a potential infringement action brought by BigStar, avail itself of common words applied in their ordinary sense to refer to a particular class of "big stars" as "Big Stars". In this example, the result may obtain even as regards an arguably non-competing product, and without the necessity of a showing by plaintiff of secondary meaning associated with its marks. To avert such a prospect, the new venture would have to resort to terms that may not suitably define its product or fit its business ends.

Seventh, there is a strong public interest consideration, identified in the potential detriment described in the preceding illustration, that militates against plaintiff's argument. The exclusive appropriation of plain speech for trade purposes hampers market entrance and restrains the equal access of a competitor to shared idiom by which to brand a vying product in terms that describe its contents and qualities or advertise its merits. We should be wary of a result that diminishes the language, that depletes the stock of common terms in general circulation and dwindles the richness of expression by placing an undue burden on the right of the public to the freest use of common words by which to call a star a "Star". As this Court reads the standards generally prevailing in this

*Enterprises Educ. Corp. v. Cove Indus., Inc.*, 297 F.Supp. 989 (E.D.N.Y.1969)); and

"FASHIONKNIT" sweaters (*Franklin Knitting Mills*, 297 F. 247, *aff'd*, 4 F.2d 1018).

Circuit, when the Court is called upon to make judgments that infringe upon what rightfully belongs to all, the bar should be set high, and the test should be made more exacting. Any ambiguities or doubts in this regard should be resolved in favor of broader, rather than narrower, access and circulation of words and terms in the public domain. *See Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F.Supp. 204 (S.D.N.Y. 1996) (aggressive efforts by the circus to assert rights to foreclose any use of the term "The Greatest [ ] on Earth", even against non-competitors, based on its long-standing use of "The Greatest Show on Earth", ruled unsuccessful).

For the reasons described, the Court finds that plaintiff's marks are not conceptually strong. Rather, the Court concludes that BigStar's marks are descriptive of its business.[10] As such, they are not entitled to protection as against Next Big Star without a demonstration of secondary meaning.

*Secondary Meaning*

 Descriptive marks like those at issue before the Court may be protected only if they have acquired secondary meaning. *See* 15 U.S.C. § 1052(f). Secondary meaning attaches if "the consuming public primarily associates the term with a particular source." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir.1992) (citing *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987)). Six factors have been identified to help establish secondary meaning. They are (a) advertising expenditures; (b) consumer studies linking the mark to a source; (c) unsolicited media coverage of the product; (d) sales success; (e) attempts to plagiarize the mark; and (f) the length and exclusivity of the mark's use. *See Centaur Communications, Ltd.*, 830 F.2d at 1222. While each factor does

not have to be proved and no single factor is determinative (*id.*), plaintiff must satisfy a "heavy" burden because "[p]roof of secondary meaning entails vigorous evidentiary requirements." *20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 90 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 134 (S.D.N.Y.1972)).

 Plaintiff claims that it has advertised and marketed its business on television and radio, in national and local print publications, and on the Internet through promotions, cross advertising and banner ads, and that it has spent approximately $12 million "[t]o date ... in aggregate marketing and advertising expenditures." Friedensohn Aff., ¶ 6. Plaintiff's purported expenditure to promote its business may evidence an effort to establish secondary meaning, but the outlay, by itself, gives no indication of the relative success of those endeavors. Conceivably, an expenditure of this magnitude may be significant, but it cannot be considered merely in quantitative terms, or in a vacuum. Plaintiff, on the record here, has not, for example, (a) offered documentary support for this financial outlay or for any annual advertising budget; (b) shown when these amounts were actually spent (*see* Tr. at 7, 34); (c) provided a precise breakdown regarding the specific manner in which these monies were allocated; (d) described any specific television, radio or websites where it promoted its business, though it did submit examples from its print campaign; (e) supplied comparative data from independent sources contrasting the extent of these commitments over the stated time frame with what other comparable starting businesses might be expected to spend; (f) analyzed the impact of the expenditures on association of plaintiff with its products in relation to the product recognition indexes of other direct competitors at comparable

---

**10.** Plaintiff's further argument that it must prevail herein because a court would not permit, for example, a "Next eBay" to compete alongside an eBay fails to recognize that the latter mark, in its trade context, is an arbitrary, and hence much stronger mark than those of plaintiff. Tr. at 69–70.

times; or (g) documented the size of the relevant market plaintiff garnered from its investment. Thus, the Court is unable to determine supportably the extent to which plaintiff's advertising efforts have been effective in causing consumers to associate "BIGSTAR" or "BIGSTAR.COM" only with plaintiff.

Second, plaintiff has not presented evidence of having commissioned customer studies, conducted interviews or gathered focus groups to test name recognition and consumer association linking the BIGSTAR marks to it. *See* Tr. at 33. Third, while plaintiff cited some media coverage and press citations (Friedensohn Aff., ¶ 7), it submitted only two newspaper articles. *Id.*, Ex. E. The Court is unable to determine from the sparse submission whether news coverage, in fact, has been unsolicited, extensive or has truly concerned BigStar, or even whether these publications address the relevant group of consumers.

Next, the sales success of BigStar's products remains unclear. Although plaintiff indicates sales greater than $13 million in 1999 (Verified Compl., ¶ 20; Plaintiff's Memorandum at 13), the Friedensohn Affidavit offers no further elaboration, and there is no documentary support in the record regarding plaintiff's market share, sales volume or the number of visitors to its website (other than a figure for the month of January 2000), all important considerations in relation to sales success. *See* Tr. at 19–20, 33–36. Furthermore, bearing in mind that a finding of intentional copying is persuasive evidence of consumer recognition, the Court finds no evidence in the present record that defendants deliberately copied plaintiff's marks or otherwise acted in bad faith (*see* discussion, *infra*) or that there has been plagiarism of plaintiff's marks by others.

Finally, regarding length of use and exclusivity, there is no magical time period which renders a mark sufficiently exclusive; the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning. The Court notes that although by itself the point is not determinative, plaintiff in this case has operated under its name for only two years. The Second Circuit has advised, however, that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength. *See Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 744 (2d Cir.1998). More recently, one court has noted that "[t]he use of the identical term by several companies to describe diverse products ... supports the Court's conclusion that the term ... is descriptive." *Ideal World Mktg., Inc.,* 15 F.Supp.2d at 244, *aff'd,* 182 F.3d 900, 1999 WL 464978. While plaintiff has claimed that exclusivity was "extremely important" (Friedensohn Aff., ¶ 5) and that "no oppositions [sic] have been brought to [its] attention" (*id.,* ¶ 10), the evidence before the Court indicates that, based in part on substantial third party use of the "Big Star" phrase and mark, plaintiff has not achieved exclusivity.[11]

Again, plaintiff's marks are currently unregistered. Third parties, including the New York clothing company Big Star Jeans USA, have requested additional time from the PTO within which to consider whether to file a Notice of Opposition in connection with plaintiff's trademark applications. Koonce Aff., ¶ 3, Ex. A. There are also trademark applications to register "Big Star" now pending on behalf of, among others, Big Star Jeans USA; a corporation engaged in restaurant services; and a corporation in the toiletries business. *Id.,* Ex. C.[12]

---

**11.** Plaintiff claimed that it was not aware of a number of Big Star video rental stores until defendants so advised in the course of this proceeding. Tr. at 37.

**12.** Exhibit C, a Trademark Research Report ("Report"), was referenced in, but not attached to, the Koonce Affidavit which the

Court received by the February 17, 2000 deadline set for the submission of documents prior to oral argument in this matter. This Exhibit was received the following day, on February 18, and the Court has exercised its discretion to accept it. However, plaintiff objected to the introduction of the document because it did not receive its copy until prior

Thus, while plaintiff may have used its marks continuously since mid–1998, such use has been anything but exclusive. Numerous examples were brought to the Court's attention of third party usage of the term "Big Star" in entertainment-related and other markets. A review of the trademark search submitted by defendants reveals that "Big Star" is registered as a trademark by companies selling, among other things, groceries; blue jeans; laundry detergents; and watches. *Id.* Big Star Jeans USA has its own website at "www.bigstarusa.com". *Id.,* Ex. D. Big Star is also the name of a 1970's rock band re-formed in 1992 that has performed in New York and whose compact discs are still being released and made available for purchase. *Id.,* Exs. E, G. And Big Star is the name of a popular grocery chain founded in 1949. *Id.,* Exs. F, G. The jeans company, the food store and the rock group are all undoubtedly recognized by many consumers and are also accessible via the Internet. Most compelling, though, are the number of entities in the film industry that use "Big Star" to describe video sales and/or rental businesses which appear to offer merchandise very similar, if not identical, to that of plaintiff. *Id.,* Ex. C at168.

This evidence of the wide incidence of "Big Star" used in commerce is neither surprising nor unforeseeable. Indeed, such recurrence is entirely predictable, as borne out by defendants' experience and that of other commercial "Big Stars" already on record. It is an outgrowth of plaintiff's choice to use self-advertising, source-identifying common words to name a trade product. It seems natural, even expected, that other ventures seeking in the entertainment market a mark to place on a related product might happen fortuitously and independently to arrive at a name like "Big Star", unaware of the existence of a similar prior mark.

Thus, under the circumstances presented here, with many other businesses already using the "Big Star" name, part of the problem faced by the Court is that to the extent a likelihood of confusion relevant to this action may exist, it reasonably may result as much from other businesses' not unforeseeable use of "Big Star" as from plaintiff's and defendants' choices of the same two common words in their marks. Thus, some of the confusion BigStar fears Next Big Star will cause may already have been caused or experienced by plaintiff on account of the number of other "Big Stars" already flashing in the commercial firmament. What type of confusion, for example, may plaintiff have caused or may it be causing or suffering itself by its business transactions in markets where brick-and-mortar Big Star video stores operate? Might consumers already familiar with the senior "BIG STAR" use by a company selling blue jeans assume, upon learning about plaintiff BigStar, that the clothing merchant has entered the entertainment industry by selling film celebrity merchandise and videos? Might rock fans or supermarket shoppers assume that plaintiff's website is affiliated with the band or grocery chain? [13] Conversely, might BigStar customers not aware of the jeans outfit suppose, upon first encountering it, that the movie superstore has expanded into a line of clothing?

Extensive third party use of the term "Big Star" as a mark, especially by businesses which may directly compete with

---

to the oral argument on February 22—February 21 having been a holiday. Tr. at 4. Aspects of the Report, in fact, were discussed during the oral argument. While the document is cited here, the Court notes that its weight is only cumulative and is not relied upon by the Court independently as a basis for a finding of extensive third party use. The record contains other evidence, already before the Court and not objected to, that ade-

quately supports a finding of substantial use of "Big Star" as a name and mark used by other businesses.

**13.** While plaintiff has opted to pursue defendants in this matter, it did not present evidence of any efforts to police the use of its marks as against other companies with identical or similar names.

plaintiff, weighs against a finding that plaintiff's unregistered marks are strong. Similarly, third party registrations undercut the origin-identifying quality and commercial strength of plaintiff's marks. Consequently, on the record here, this Court declines to find that plaintiff has met its burden to prove that the consuming public associates the "BIGSTAR" marks with a single source or that plaintiff's marks have yet acquired secondary meaning. Plaintiff's "BIGSTAR" marks, comprised of ordinary words and coexisting with extensive third party usage, cannot be said on this record to be associated by prospective purchasers with a particular source. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir.1983).

### (2) Degree of Similarity between Plaintiff's Marks and Defendants' Mark

(a) General Impressions to the Public

In assessing the degree of similarity between competing marks, the Court must endeavor to determine whether any similarity is likely to create confusion. For this purpose, it looks to "the general impression conveyed to the purchasing public by the respective marks." *Centaur Communications, Ltd.*, 830 F.2d at 1226 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985)). We have considered the various aspects of the marks and the accompanying logos with which the marks appear, and find that they differ in several significant ways from one another and that these differences weigh against a finding of the likelihood of consumer confusion.

We start with basic content, or the words comprising the marks. As an initial matter, we note that in this case, in order to adequately and accurately capture the sight, sound, meaning and overall effect on perception of the terms at issue, the prop-

er starting point for comparison should be between the parties' respective trademarks, rather than their domain addresses. The trademarks provide a broader dimension for analysis. Website addresses by themselves, characterized by the style of uniformly lower case lettering and compressed wording, do not adequately express certain nuances of common meaning and understanding of words in the marks at issue in this case. In fact, here, a contrast based on the web addresses alone, unaided by the clarifying word meaning conveyed by the parties' corresponding trademarks, would tend to distort intended connotations.

Plaintiff's marks contain two common words, "big" and "star", both words joined to form one, as either "BIGSTAR" or "BIGSTAR.COM". Defendants' mark, no more inherently distinctive than plaintiff's, adds an extra common word ("Next") alongside these other ordinary words, but does not combine them, thus giving the intended plain connotation that the aim of defendants' talent search is to identify and publicly introduce the "next" big star.[14] Plaintiff offers a different, self-directed interpretation of defendants' name. Friedensohn Aff., ¶ 14. It argues that an unknowing consumer could unwittingly infer that the "next" in defendants' name could refer to plaintiff BigStar and conclude that the two entities are somehow associated. It is in this connection that it is essential here to commence the analysis with a comparison of the trademarks. Plaintiff's contention may be more persuasive on this point if the mark chosen by defendants had been "Next BIGSTAR" or "NEXT BIGSTAR". In that event, "Next" clearly would modify and announce the coming "BIGSTAR".

The plain impression transmitted by the words "Next Big Star" in a trademark,

---

14. Defendants point out that in presenting the winners of the talent search shows Ed McMahon previously hosted, Mr. McMahon typically announced "stay tuned for the next big star" or "I'm pleased to introduce televisions [sic] next big star, etc." Gerber Aff., ¶ 4.

Defendants are also publicizing their talent search by using a promotional tape on which numerous actors remind viewers that "you could be the next big star." Gerber Aff., Ex. A.

however, is clearly different and consistent with defendants' stated intentions. This perceptual nuance is lost if the comparison, as plaintiff's argument implies, is grounded on the web domain names alone. In that context, the sight, sound and meaning of "bigstar" and "nextbigstar" create an altogether different impression that fails to convey the essential, distinguishing subtlety intended by defendants here. But it is noteworthy in this regard that the ordinary, reasonably informed web consumer would have no more basis for distinguishing among plaintiff's "bigstar.com" address and "bigstarusa.com" (the jeans company) and "nextbigstar.com" or any other businesses which may be using the same words in their domain names. It is entirely plausible in this uniform website style, absent other aids to perception, that the web consumer could interpret the "next" in defendants' name to refer as much to the jeans mark as to plaintiff's. Moreover, plaintiff's argument does not take into account that the Internet is not the sole source from which consumers obtain information about products and services. Through print, audio and video media, the public which uses the web could learn that "Next Big Star" describes defendants' talent search and is not related to plaintiff's movie superstore. Plaintiff has also argued that defendants should "take the word 'big' out of their name." Tr. at 74. The Court finds, however, that this additional third word serves to distinguish sufficiently defendants' mark from plaintiff's non-distinctive marks.

Second, the use of trademarks is always accompanied by other indicia of origin, such as a logo or graphic symbol or other words which serve to minimize confusion. Defendants' website logo now includes the phrase "ED McMAHON'S" immediately above the phrase "nextbigstar.com", so as to read in its entirety "ED McMAHON'S nextbigstar.com". Koonce Aff., Ex. I. Similarly, plaintiff's web logo reads "bigs-

tar.com" and frequently appears with "MOVIE SUPERSTORE" immediately below. These added words are sufficient to dispel confusion as to origin and sponsorship.[15]

Next, while each logo contains a five-pointed red star, the location, purpose and related symbolism of the stars are different. The "i" in plaintiff's "bigstar.com" website logo is dotted with the red star outlined in black. The star in defendants' logo takes the place of the dot in ".com". Also noteworthy is that plaintiff has the five-pointed star generally in the upper left corner of its pages, while defendants utilize a star on virtually every page as an identifier to highlight subjects clicked by visitors. While each star is attached to an extended design, the colors and designs also differ. Plaintiff's star projects what it calls a bluish-gray tail like that of a shooting star, showing it has streaked across the sign from the right to the left. Defendants assert that their website logo is intended to be viewed as a "moving image", creating the impression that the beam above the star serves as a searchlight. Defendants' Memorandum at 16. On the printed version, defendants' logo has a red beam projecting angularly up from the star. *Id.*

Furthermore, the typeface, or font, and the coloring of the remaining parts of the marks and logos are sufficiently different. The fact that neither domain name is in capital letters is of no moment, as all online lettering and Internet addresses are in lower case letters. Plaintiff's "bigstar" is in black, and ".com" is in red. Defendants' "nextbigstar" and ".com" are in yellow, with "ED McMAHON'S" name appearing in white or red. Koonce Aff., Ex. I. These are further differences which contribute to minimize the likelihood of confusion. When plaintiff's and defendants' names and marks are compared in their entireties

---

**15.** During oral argument, in response to inquiries by the Court, defendants expressed a willingness to further adjust their website to contain a disclaimer of any connection with plaintiff's business. Tr. at 67–68. Plaintiff declined to consider cross-disclaimers of this nature as potentially adding to confusion. Tr. at 24–25.

along with their logos, it becomes clear that, despite sharing minor coloring and lettering, the respective uses of similar terms convey different sight, sound and meaning impressions to the public and are not likely to confuse prospective purchasers as to the source of the products.

(b) Initial Interest Confusion

■ Finally, in connection with this *Polaroid* factor related to the similarity of marks, BigStar raises an issue that introduces the unique dimensions of the World Wide Web and demands an inquiry regarding the applicability of a legal doctrine developed in other contexts. Plaintiff, as an instance of the likelihood of consumer confusion between the two names here in question, invites the Court to recognize initial interest confusion which may be caused in the Internet context when an initially interested consumer searching for plaintiff's "bigstar.com" website uses a search engine for assistance and is drawn instead to defendants' "nextbigstar.com" site because of the similarity between the web addresses. Plaintiff's Memorandum at 15–16; Tr. at 14–15. The concern is that many of those initially interested potential customers of plaintiff's would be diverted and distracted by defendants' site and would either believe that defendants' site is associated with plaintiff's or would not return to plaintiff's domain. *Id.* at 15–16.

The diversion of initial interest and the resulting relevant confusion under this doctrine relate to what *draws* the consumer to the *other* location in the first place. Even if the customer quickly becomes aware of the competing source's actual identity and can rectify the mistake, the damage to the first user that the courts have identified manifest in three ways: the original diversion of the prospective customers' interest; the potential consequent effect of that diversion on the customer's ultimate decision whether or not to purchase caused by an erroneous impression that two sources of a product may be associated; and the initial credibility which may be accorded by the interested buyer

to the junior user's products—customer consideration that otherwise may be unwarranted and that may be built on the strength of the senior user's mark, reputation and goodwill. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1063–64 (9th Cir.1999), and cases cited therein.

The initial interest confusion doctrine was developed by the Second Circuit in connection with Lanham Act infringement disputes involving trademarks of products in brick-and-mortar store commerce. *See Mobil Oil Corp.*, 818 F.2d 254; *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975). The doctrine has not been adopted by this Circuit in the context of alleged infringement arising on the Internet. *See New York State Soc'y of Certified Pub. Accountants v. Eric Louis Associates, Inc.*, 79 F.Supp.2d 331, 356, n. 5 (S.D.N.Y. 1999). However, the doctrine as applied by the Second Circuit has made clear that the particular instance of infringement at issue derived from just a particular variety of potential customer confusion and that the analysis to be applied to gauge the likelihood of such confusion rested on the same *Polaroid* factors which guided the appraisal of other recognized forms of trademark infringement confusion. This Court sees no reason why the approach to that assessment would be substantially different were the doctrine to be applied to the facts of this case and an infringement claim arising out of trademarks used for commerce conducted through the Internet.

In support of its argument, plaintiff cites *Brookfield Communications, Inc.*, 174 F.3d 1036. In that case, the Ninth Circuit, in applying a likelihood of confusion analysis in the Internet context, although acknowledging the relevance of other tests, considered three factors as "most important" to the case: (1) the virtual identity of marks; (2) the relatedness of plaintiff's and defendants' goods; and (3) the simultaneous use of the web as a marketing channel. *Id.* at 1054–58. It is noteworthy

that the full range of the considerations the court relied upon in its analysis is essentially the same as the *Polaroid* factors. It held that the defendant-West Coast's "moviebuff.com" domain name was "essentially identical" to plaintiff-Brookfield's "MovieBuff" trademark in "terms of sight, sound and meaning." *Id.* at 1055. The court further held that the competitive proximity of the parties' products was actually "quite high" because "their principal lines of business both relate to movies specifically" and their products were "[u]ndeniably ... used for similar purposes." *Id.* at 1056. Accordingly, the Ninth Circuit found a strong likelihood of confusion and concluded that Brookfield had demonstrated a likelihood of success on its infringement claim that West Coast's use of the "moviebuff.com" domain name violated the Lanham Act. *Id.* at 1060–61.

The Court in *Brookfield* further considered whether, as plaintiff-Brookfield charged, West Coast's use of marks confusingly similar to "MovieBuff" in metatags constituted trademark infringement. *Id.* at 1061–65. This "buried code", not visible to consumers using the web, is employed by domain name search engines or directories in displaying a list of the particular website or sites which correspond to the specific descriptive keywords supplied by companies in connection with their Internet name registrations as part of their characterization of the content of and directions to their websites. The websites corresponding to those keywords appear on the computer screen as the engine's response to a browser's inquiry into a searchable database that employs any of the various metatags' code and word combinations by which the Internet company may seek to channel "directory assistance" traffic to its web address. *Id.* at 1061–62; n.23. It was in this context that the Ninth Circuit held that West Coast's use of "moviebuff.com" in metatags would result in initial interest confusion "in the sense that, by using 'moviebuff.com' or 'MovieBuff' to divert people looking for 'MovieBuff' to its website, West Coast improperly benefits from the goodwill that

Brookfield developed in its mark." *Id.* at 1062. Accordingly, the court held that this form of initial interest confusion occurring in the medium of the Internet was also actionable under the Lanham Act. *Id.* at 1063.

The *Brookfield* case is distinguishable from the one presently before this Court for several important and mitigating reasons. There, the plaintiff specifically requested injunctive relief against defendants' use of metatags identical to plaintiff's mark. *Id.* at 1061. Here, there is no evidence, or even an allegation by BigStar, that defendants have used "BIGSTAR" or "BIGSTAR.COM" in metatags by which they have diverted to their site the initial interest of potential buyers looking to patronize BigStar. Moreover, plaintiff's argument suggests that potential customers searching for BigStar's domain could be directed by a search engine to defendants' website, that these customers would then assume that defendants' website is somehow associated with the plaintiff's and that they may decide to remain at defendants' site. The core of this argument is that the initial confusion the prospective patrons may encounter by virtue of defendants' mark relates to the *source*. In *Brookfield*, the Court found that there was "no source confusion", in the sense that consumers reaching defendant's web site would know they were patronizing West Coast rather than Brookfield. *Id.* at 1062. The *Brookfield* analysis, in fact, would reject the theory BigStar propounds here. The Ninth Circuit, despite the virtually identical names at issue, noted that "[s]ince there is no confusion resulting from the domain address, and since West Coast's initial web page prominently displays its own name, it is difficult to say that a consumer is likely to be confused about whose site he has reached or to think that Brookfield somehow sponsors West Coast's web site." *Id.* at 1062.

Where the *Brookfield* court found wrongful initial interest confusion was in defendants' knowing or intentional use of plaintiff's mark in defendants' metatags, which had the effect of diverting customers looking for Brookfield's products to West Coast's website, thereby enabling defendant to profit from plaintiff's established goodwill and reputation. *Id.* at 1061–65. As stated above, neither the use of metatags by Next Big Star nor evidence of its bad faith in that connection is at issue in the case before this Court.

Second, even if the initial interest confusion through search engine diversion were inadvertent, plaintiff's arguments fail for other reasons that weighed heavily in the *Brookfield* decision. In *Brookfield,* and in other cases bearing on this point, the infringing domain name was masquerading as or was virtually identical to the trademark. *See id.* (domain "moviebuff.com" compared with "MovieBuff" mark). *See also Interstellar Starship Services, Ltd. v. Epix Inc.,* 184 F.3d 1107 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1161, 145 L.Ed.2d 1073 (2000) ("epix.com" domain name compared with "EPIX" trademark); *Eric Louis Associates, Inc.,* 79 F.Supp.2d 331 (domain name "nysscpa.com" caused likelihood of confusion with "NYSSCPA" mark); *SNA, Inc. v. Array,* 51 F.Supp.2d 542 (E.D.Pa.1999) (use of plaintiff's exact mark "Seawind" for defendant's "seawind.net" website address highly likely to cause confusion); *Cardservice Int'l, Inc. v. McGee,* 950 F.Supp. 737, 741–42 (E.D.Va.1997), *aff'd,* 1997 WL 716186 (4th Cir.1997) (where companies both provided credit and debit card services, use of defendant's "cardservice.com" domain name "exactly duplicates" and infringes plaintiff's registered "Cardservice" trademark).

By contrast, the *Brookfield* court suggested that variations or distinctions in the names, even though minor or subtle, might have made a difference in the equities in determining the likelihood of confusion. The *Brookfield* district court had found that defendant's domain name "moviebuff.com" was quite different from plaintiff's "moviebuffonline.com". *Brookfield Communications, Inc.,* 174 F.3d at 1055. The Ninth Circuit, rejecting the lower court's analysis, determined that the proper comparison of the allegedly infringing mark was not the domain name but the claimant's trademark, which was "MovieBuff", and rendered the two competing names "essentially identical." *Id.* at 1055. Interestingly, the Court added that "[t]he fact that West Coast's second-level domain is *exactly* the same as Brookfield's mark is particularly important since potential customers of 'MovieBuff' will go to 'moviebuff.com,' and not, for example, 'moviebuffs.com'. Had West Coast used the latter mark, the similarity factor would have favored Brookfield to a lesser extent." *Id.* at n. 18.

Here, defendants' domain name ("nextbigstar.com") is not "virtually identical" to plaintiff's trademarks or website ("bigstar.com"). Defendants are not using "bigstar.com" as their domain name. Instead, they are using "nextbigstar.com", a domain name which, when examined in the light of the entire context relevant here (*see* discussion, *supra*), is neither identical to the BigStar marks in terms of sight, sound or meaning, nor one the ordinary, reasonably informed relevant purchaser could not regard as exactly the same.

Third, plaintiff's reliance on *Brookfield* and its initial interest analysis fails also because of the identity or close relationship between products involved there and in other cases applying the doctrine. These cases, though stressing that the real test for infringement was the likelihood of confusion rather than direct competition, found strong competitive proximity between the products offered by the rival claimants. Accordingly, as in the case of likelihood of other kinds of confusion, the form associated with the diversion of initial interest presumably would not arise, or would be minimized, in circumstances where the products in question are used for substantially different purposes and therefore the merchants are not in close

competitive proximity, even if there may be some similarity between their marks. *Brookfield Communications, Inc.*, 174 F.3d at 1056.

This Court has found that the parties here are not in direct competition with one another, (*see* discussion, *infra* ) and their marks and businesses are not sufficiently closely related. *See* discussion, *supra.* The Court deems it unlikely that an appreciable number of ordinary, reasonably informed potential customers searching for "bigstar.com" to purchase a video or obtain movie star information who mistakenly navigate to the talent search at "nextbigstar.com" would be confused in that they would assume, despite the dissimilarities in the marks, that the two websites are associated. Similarly, we view it as unlikely that numerous such prospective video customers, upon realizing an error in reaching the wrong website, would not resume their endeavor to find the product they originally sought by reason of some attraction to defendants' talent competition. To the extent that the likelihood of some such confusion may nonetheless remain on account of this factor, the Court believes it would not be actionable under the circumstances presented by this case because the operation of the other *Polaroid* factors still weigh heavily against this finding.

Fourth, an essential element present in the facts of the Second Circuit initial interest confusion cases and in *Brookfield* was a strong mark and firmly established product quality, goodwill and reputation developed by the first user. The junior user, offering competing goods, sought knowingly to benefit from public recognition of the senior company's name and credibility by seeking to attract potential customers the infringer ordinarily would not have had. In *Brookfield,* for example, the court determined that plaintiff's mark was suggestive, therefore not requiring a showing of secondary meaning to establish eligibility for protection. Here, as the Court has found, BigStar's marks are descriptive. There is an insufficient record to sustain a finding that plaintiff has established long-

standing public recognition of its name, reputation and goodwill or that defendants sought to build their own clientele on the strength of any credibility derived from plaintiff's trademarks.

Fifth, in the initial interest confusion cases arising in the context of the Internet, the similarity of marks at issue involved only two essentially identical names, under circumstances in which either both or only one had established a domain on the World Wide Web. No indication of substantial third party use of the same domain name was involved. Where only two entities are claiming rights to exactly the same or essentially similar mark on the Web, there is a strong likelihood that a prospective customer initially searching for the senior business may be diverted to the junior. But in a case such as here where there is evidence of use by third parties of other "bigstar" web addresses, the likelihood of confusion attributed to initial interest diversion by any one of the users of the mark becomes more speculative and difficult to substantiate, except by strong evidentiary demonstration. In that event, a search engine inquiry originally seeking plaintiff's "bigstar.com" address would produce the sites of the various domains containing other "bigstar.com" addresses as well, to any one of which the prospective purchaser theoretically could be diverted, and not just to defendants' site.

Finally, the only Second Circuit case to refer to the *Brookfield* decision has been *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,* 202 F.3d 489 (2d Cir.2000). In that case involving the new Anticybersquatting Consumer Protection Act, the court considered, among other things, whether the domain name "sportys.com" was identical or confusingly similar to the "sporty's" trademark. *Id.* at 497–98. In holding that the secondary domain name ("sportys") was "indistinguishable" from and confusingly similar to the "sporty's" trademark, the court cited *Brookfield* for the proposition that certain perceived differences between a mark and domain name, like the

apostrophe and use of ".com", are inconsequential. *Id.* at 498. The Second Circuit did not address initial interest confusion in the context of an Internet case.

For the foregoing reasons, this Court declines to apply this initial interest confusion doctrine in the context of the Internet in an case involving (1) non-competitors; (2) web addresses not virtually identical; (3) weak marks without sufficient evidence of secondary meaning; (4) substantially different products; (5) similar names and trademarks used by other third parties; (6) no intentional use of plaintiff's marks by defendants in defendants' metatags; and (7) no evidence of bad faith efforts by defendants to divert patronage by trading on any name, goodwill or reputation plaintiff may have established.

### (3) **Proximity of Products**

■ The proximity factor is designed to focus on whether the products or services of the rivaling trademark claimants compete with each other. *See W.W.W. Pharm.*, 984 F.2d at 573. In examining this consideration, the Court is mindful that the factor should not be overemphasized any more than the others, and that the focus under section 43(a) of the Lanham Act remains whether the relevant ordinary, reasonably informed consumer is likely to be confused by the parties' marks into somehow associating defendant's goods with plaintiff's. The products and services of the two enterprises here are not as different as toys and guns. At the same time, while the Court recognizes that here both parties transact business in somewhat different corners of the same general market, it finds difficulty in substantially equating their products for the purposes of assessing the likelihood of confusion. This consideration is especially significant in the light of the Court's finding that the proper classification of plaintiff's marks is descriptive. Consequently, the marks are weak, limiting the scope of protection to which they are entitled with-

in a narrower test of market and product similarity. *See AMF Inc.*, 599 F.2d at 350.

To begin, we look to the nature of the parties' businesses. At bottom, both are grounded in entertainment, though different facets of it. Plaintiff is an "online filmed entertainment superstore." Friedensohn Aff., ¶ 2. It is the Internet equivalent of a major brick-and-mortar video outlet, offering a selection of over 40,000 feature films. *Id.* Defendants, on the other hand, are in the talent competition business, the online version of a "nationwide/worldwide" search for talent in over fifty performing categories. Gerber Aff., ¶ 3.

The two enterprises offer distinctly different goods and services for sale. Plaintiff sells products—tangible, high quality videocassettes, DVDs and movie merchandise—and provides information at its website about movies and the people in them. In contrast, defendants offer a service: the opportunity to would-be entertainers to register and then compete in a talent show defendants' sponsor.[16] It is probable that these ventures share some potential customers interested generally in entertainment. Their products, however, are not used together, nor are they directly competing. BigStar aims for movie buffs, those who want to watch movies and to learn about the celebrities who produce, direct and act in them. Next Big Star, in the hope of finding tomorrow's performers, targets aspiring actors, singers, comedians and dancers all of whom share a search for outlets for their talents and ambitions. In this respect, a temporal span distinguishes the parties' products. Plaintiff, concentrating mainly on the film industry, looks to the stars of the present and the past. Defendants, encompassing wider pools of emerging talent, search for the next celebrities of the future.

Both plaintiff and defendants presently only contemplate the use of television.

---

**16.** For purposes of this discussion, the Court refers to defendants' talent competition as their "product".

But this aspect of their businesses is also sufficiently distinct. Plaintiff proposes a weekly program on a *cable* shopping channel which will enable plaintiff to sell its merchandise, while providing viewers with information about movies and celebrities. Friedensohn Aff., ¶ 8. There is no indication in the record as to the precise day of the week or the time when the show would air. Defendants' programming is to be "ancillary support for [their] essential and fundamental business proposition which is to have talent searches on the web." Tr. at 66. Defendants plan to produce four specials each year on *network* television where their Internet talent contest winners may compete again for more prizes. Gerber Aff., ¶ 9. The parties' television shows as planned would so differ in content, schedules, markets and business objectives that it cannot be said they would truly compete with one another.

Finally, there may be a slight overlap between the free, supplementary services provided by both plaintiff and defendants. Plaintiff's website, accessory to the sale of videos, offers information about the movie business, film previews, and interviews and chats with celebrities. Friedensohn Aff., ¶ 2. The interviews and chat rooms at defendants' site are intended to promote the talent contest. Whatever similarities may exist between the two secondary services are of little consequence for two reasons. Many websites provide chat rooms. More importantly, these services do not compete for the Internet user looking generally for information regarding celebrities because the scope of information and interviews provided by defendants is much more narrow than that of plaintiff. Gerber Aff., ¶ 8. These services are simply not the main components of either business, nor are they the means by which either company derives direct income.

Based on the foregoing, this Court concludes that there is insufficient competitive proximity between defendants' talent competition service and plaintiff's sale of movie videos and related merchandise. The Court, therefore, declines to find that relevant, ordinary purchasers are likely to be confused by virtue of products that are essentially non-competing.

#### (4) **Likelihood that Plaintiff Will Bridge the Gap**

The fourth factor to gauge likelihood of confusion requires the Court to consider the prospects that BigStar will enter defendants' business, or to assess the "average consumer's perception of the likelihood" that BigStar would enter defendants' market. *See Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963 (2d Cir.1996). This factor protects the senior user's interest in safeguarding avenues of future expansion into a related field which could create both direct competition with the junior user and the likelihood of confusion.

Plaintiff argues that there is no gap to bridge because it already competes directly with defendants. Plaintiff's Memorandum at 18. This Court has concluded that BigStar and Next Big Star are not in direct competition. *See* discussion, *supra.* Plaintiff next asserts that it plans to bridge any gap by expanding into television, which will put it in the same medium as defendants and the same market as defendants' television show. Plaintiff's Memorandum at 19. Plaintiff's alternative argument, however, is inapposite, for it is the business, not the medium or the market of the medium, that controls. Defendants conduct talent search competitions on the Internet; they are in the business of developing, promoting and operating online talent competitions and producing a related competition on network television for their Internet talent winners that will be aired only four times a year.

While plaintiff has designed a weekly cable television program to sell its wares and provide movie industry information, plaintiff has expressed no intent nor offered plans to enter the talent show business in any medium, nor has it provided any evidence that the public believes that plaintiff's video superstore would expand into defendants' talent competition service. *See* Tr. at 12. Accordingly, this Court finds that this factor does not weigh in

favor of finding likely confusion. *See Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 172 (2d Cir.2000) (no intent by Federal Express to enter the coffee business); *Sports Auth.*, 89 F.3d at 963 (senior user presented no plans to enter business of junior user and provided no evidence that the public believed it would); *W.W.W. Pharm.*, 984 F.2d at 574 (no intent to expand product line).

### (5) Actual Confusion

Evidence of actual confusion between products is a strong indicator that likelihood of confusion exists. Such confusion, of course, is especially difficult to establish when the alleged infringing mark, like that of defendants herein, is so very new. On this basis alone, given the present record, there is insufficient ground to support a conclusion that actual confusion exists in the market place between BigStar and Next Big Star. As described above, to the extent actual confusion related to BigStar may exist, there is as much if not more basis to attribute it to the numerous other businesses using "Big Star" in their trademarks as there is to ascribe the cause to defendants' recent commercial use of the same two words. Therefore, this Court declines to draw any inferences as to likelihood of confusion attributable to this factor.

The Court nonetheless notes that plaintiff has not offered any convincing supportive evidence regarding this issue at this time. It did not introduce any mistaken orders, complaints from customers or website visitors, market surveys or other signs of uncertainty reflecting actual consumer confusion. It did cite the anecdotal evidence of one purported incident at a financial website message board (*see* Plaintiff's Memorandum at 19–20; Koonce Aff., Ex. J) that involved an investor who was posing a question about the parties' affiliation but who apparently was not interested in either plaintiff's products or defendants' service.[17] Koonce Aff., Ex. G. A single query into the possible relationship between trademark claimants does not constitute legally sufficient evidence of actual confusion. *See Gruner + Jahr*, 991 F.2d at 1079.

### (6) Defendants' Good Faith in Adopting their Own Mark

The sixth *Polaroid* factor focuses on "whether the defendant[s] adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [defendants'] and the senior user's product." *Lang*, 949 F.2d at 583 (quoting *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)).

Plaintiff concedes that defendants' good faith is not presently known and is "at most, neutral." Plaintiff's Memorandum at 23. In contrast, defendants argue strenuously that none of the individuals involved in defendants' selection or approval of the "Next Big Star" mark knew of plaintiff's marks until this action was commenced. Gerber Decl., ¶ 2; Defendants' Memorandum at 22. Defendants further maintain that "Next Big Star" was selected as an extension of a phrase which Ed McMahon used regularly when introducing contestants on the Star Search television talent shows he hosted. Gerber Aff., ¶¶ 4, 7.[18]

On the present record, there is no evidence that defendants intentionally copied plaintiff's marks; or adopted their mark with the intent of reaping commercially from plaintiff's marks; or otherwise exhibited bad faith in selecting their name or trademark. To the contrary, defendants have offered what the Court believes, at least at this time, is a plausible explanation

---

17. In fact, the same message board triggered memory associations and queries about other "Big Star" businesses, in particular the supermarket chain and the rock band.

18. This Court accords no weight to defendants' intimation that Mr. McMahon actually selected the "Next Big Star" mark from a list of available domain names (*see* Defendants' Memorandum at 22 citing Gerber Affidavit; Tr. at 57–58) because the Gerber Affidavit is silent on this score.

for the origin and meaning of their mark, coupled with a significant modification to their logo prior to oral argument. As such, this Court cannot conclude at this stage of these proceedings that defendants were aware of plaintiff's marks before adopting their own or that they chose their mark in order to capitalize on any goodwill and reputation already established by BigStar. Accordingly, this factor militates against finding a likelihood of confusion.

### (7) Quality of Defendants' Product

The seventh factor is central when there is an allegation that a low quality product is taking unfair advantage of the public goodwill earned by an established high quality product. *See Gruner + Jahr*, 991 F.2d at 1079. In the case before this Court, no such allegation has been made, nor could there be. The record is silent as to the quality of defendants' services, and plaintiff concedes that the quality of defendants' services is "not definitively known at this time" (Plaintiff's Memorandum at 23) and that "it is too early to ascertain exactly what the quality of those services will be." *Id.* at 22. *See* Tr. at 13–14. Because of the uncertain quality of defendants' nascent services, coupled with the possibility that defendants' products may turn out to be of high quality, this Court finds that this factor is, at best, neutral at this time.

### (8) Sophistication of Buyers

The final *Polaroid* factor "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *McGregor–Doniger, Inc.*, 599 F.2d at 1137. As a general rule, unsophisticated purchasers increase the likelihood of confusion, especially "when the competing products' marks are similar and the inexpensive products are in competitive proximity." *Hasbro, Inc.*, 858 F.2d at 79. In contrast, a finding that relevant buyers are sophisticated militates against a finding of likelihood of confusion.

The gist of BigStar's complaint, as is generally the case in most infringement actions, is that *some* consumers reached by Next Big Star's advertising and website will somehow mistakenly associate it with plaintiff's products and services. The standard for testing likelihood of confusion, however, is not absolute. Indisputably, there is always some likelihood that some number of consumers encountering two product names bearing some resemblance could erroneously assume they derive from the same source. In order to assess the reality and magnitude of that likelihood, the pertinent inquiries should be how appreciable is the number of such relevant purchasers; whether the number encompasses ordinary, reasonably informed and reasonably prudent consumers; whether those potential customers are found in the markets in which the parties actually compete; and whether other demonstrable circumstances exist that work to diminish substantially the likelihood of confusion, in particular, the other *Polaroid* considerations already discussed above.

The Second Circuit has long held that "the crucial issue in an action for trademark infringement . . . is whether there is any likelihood that an *appreciable number* of ordinarily *prudent purchasers* are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (emphasis added). *See Gruner + Jahr*, 991 F.2d at 1077 (test is whether *numerous ordinary prudent purchasers* are likely to be misled or confused). In this context, therefore, plaintiff must establish that the number of reasonably prudent purchasers likely to be confused by the purported similarity of the marks and products here at issue is appreciable.[19]

---

**19.** Under this Circuit's well-established standard, plaintiff need not prove that all consumers are likely to be confused. Similarly, there

may be a level of confusion for which plaintiff may not be able to obtain any relief.

A determination of the relevant ordinary prudent purchasers herein introduces some other dimensions and considerations peculiar to disputes arising out of merchandising on the Internet.[20] How broadly should the universe be defined to identify the pertinent market for the purposes of assessing susceptibility to confusion of similarly named products traded online? Should the web audience encompass a representative cross-section of all who daily browse and shop and otherwise navigate the Internet's wide-ranging services, thereby spreading the base and skewing the curve downward to the level of the least sophisticated? *See Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 293 (3d Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). Or should the measure be taken by applying the standard to a narrower, more targeted field? Given the ever increasing reach of the Internet and the almost universal presence of telecommunications, the market of relevant purchasers is indefinite. Purchasers may transact business from home, the office and other convenient places and reflect the full spectrum of the general population, not only of the whole country, but indeed of the World Wide Web.

■ In this Court's view, the relevant purchasers relied upon for purposes of gauging sophistication in the Internet context should not encompass the broad sweep of that general population. Rather the measure should be circumscribed to the class of buyers who are prospective purchasers of the parties' products, the same market audience of reasonably informed and reasonably prudent consumers that serves as the base group by which to test likelihood of confusion and the qualities or characteristics relied upon to examine the strength of a trademark.

■ The Court recognizes that even with the winnowing to this narrower audience, the relevant population here remains both expansive and diverse, a difficulty not unexpected in the context of the Internet. Within the general public, the number of people who display interest in entertainment services and who may visit the websites and purchase the services provided by both plaintiff and defendants, is vast and is likely to encompass individuals from every corner of society. It may reach both the casual and the discriminating, those who are very knowledgeable, the professionals and the sophisticated devotees, as well as ordinary, unknowledgeable people who avail themselves of all accessible outlets for entertainment. The degree of sophistication embodied by this diverse audience will vary correspondingly. In addressing a related issue in an infringement case, the Second Circuit determined that where the target audience for a product includes both the casual and the discriminating purchaser, the court must consider the likelihood of confusion to both groups. *See Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971).

In conducting this analysis, this Court notes the distinction case law recognizes regarding the likelihood of confusion involving expensive versus inexpensive goods. The ordinary, reasonably prudent and reasonably informed customer is expected to be more discerning and less likely to be confused in inverse proportion to the price of the product. Thus, greater likelihood of confusion is presumed in the case where relatively inexpensive items are purchased. *See W.W.W. Pharm.,* 984 F.2d at 575.

The price of the products here in contention may not be great, but seems sufficiently high to reduce the buyers' clicking impulse and to serve to define more narrowly one segment of the relevant web market to the more interested, probable purchasers of the parties' products. Defendants' registration fee for each entrant

---

**20.** The Court does not focus on buyers who are television viewers because the parties are not currently producing their television shows, and there is no evidence bearing on this issue in the record.

is $19.95. Friedensohn Aff., Ex. H. The unit price of plaintiff's videocassettes, DVDs and merchandise, though it not entirely clear from the record, could be under $20.00 per item. Friedensohn Aff., Ex. A.

In addition, while some courts have noted that purchasing goods on the Internet does not necessarily require great sophistication and is as easy as clicking and punching numbers on a computer screen (see Something Old, Something New, Inc., v. QVC, Inc., 1999 WL 1125063, at *10, 1999 U.S. Dist. LEXIS 18878, at *33–34 (S.D.N.Y. Dec. 7, 1999)), this Court offers another perspective. The manner in which products may be purchased on the web and the requirements imposed upon prospective buyers cannot be overlooked, and must be distinguished from generally prevailing norms associated with purchases of inexpensive cash items at brick-and-mortar stores. The latter encompasses the entire population. It takes no technical knowledge, level of education or sophistication or credit rating to place a small cash amount for an inexpensive purchase over the counter. The web visitors who decide to buy, on the other hand, include only those who have some level of sophistication with the technology to be able to locate the product and the seller and who are generally limited to purchasing only with credit cards or checks.

Holders of credit cards and checking accounts, being required to possess sufficient employment and earning capacity to pass a credit rating and become eligible for the issuance of checks or credit cards, are likely to include a larger proportion of sophisticated purchasers than the entire population of cash purchasers of inexpensive goods (which would include, for example, children not eligible for credit cards or checking accounts). Accordingly, plaintiff's website customers would have to spend time creating an account and inevitably may have to provide, at least initially, a password, an e-mail address, a billing address, shipping address, shipping method and payment information prior to completing a purchase. Similarly, the individual visiting and enrolling in defendants' talent competition is required to copy or print an entry form, provide the information requested and then mail the completed form, registration fee and videotaped performance to defendants. Friedensohn Aff., Ex. H. These prerequisites demand a certain level of commitment and motivation that is likely to further refine the compass of the relevant ordinary, reasonably informed purchasers by lifting the overall level of sophistication on the strength of the stalwarts.

This eighth factor consequently is dependent on the quality of potential website buyers, not casual visitors just surfing through, as its control set for sophistication. While this Court appreciates that, whatever the commercial outlet, the typical buyer displays greater care when expensive products are considered for purchase, the price in this case, coupled with the careful process requiring interested buyers to provide critical information about themselves, will necessitate that prospective buyers of the parties' products possess some sophistication, at least a few notches higher than that of the typical purchaser of inexpensive over-the-counter cash items or the Internet universe as a whole. Although in the instant case this factor is close, the Court believes that there is also a sufficient level of sophistication among relevant purchasers which minimizes the likelihood of confusion as between the parties' products.

### Balancing of Polaroid Factors

In sum, after balancing the Polaroid factors in view of the record before it, the Court concludes that plaintiff's marks are weak as a result of their component common words and lack of secondary meaning; that defendants' mark is not sufficiently similar to those of plaintiff; that the actual competition between the products of plaintiff and defendants is insubstantial; that plaintiff has not expressed an intention to expand into the entertainment talent search business; that there is currently no evidence of actual confusion

caused by defendants' product, or of bad faith on the part of defendants; and that the buyers in the relevant markets will have a degree of sophistication sufficient to enable them to distinguish between the trademarks and products at issue here. Accordingly, the Court finds that BigStar has not proven that defendants' use of the "Next Big Star" mark will create a likelihood of confusion among consumers as to product source, sponsorship or origin.

### (2) *Unfair Competition and Unjust Enrichment Claims under New York Law*

 Plaintiff elected to focus its argument on its federal trademark infringement claim, suggesting that a "finding of likely success on that claim generally implies a similar result on the related common law claim." Plaintiff's Memorandum at 9, n. 5; Tr. at 15. Proof of likelihood of confusion is also essential to prevail on plaintiff's common law unfair competition claim. *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983). Since plaintiff has not established a likelihood of confusion in connection with its Lanham Act claim, this failure disposes of plaintiff's state claim for unfair competition and its argument that it is likely to succeed on the merits of this claim under New York law. *See Gruner + Jahr*, 991 F.2d at 1080.

Plaintiff further argues that a finding of likely success on its Lanham Act and unfair competition claims will support a claim for unjust enrichment. *See* Plaintiff's Memorandum at 9, n. 5; Tr. at 15. The fifth count of plaintiff's verified complaint asserts that the willful misappropriation and wrongful use of the Next Big Star mark "has caused Defendants to be unjustly enriched at plaintiff's expense such that Defendants have obtained good will and profits that rightly belong to BigStar." Verified Compl., ¶ 57. An unjust enrichment claim under New York law requires that defendants be enriched; that the enrichment be at plaintiff's expense; and that defendants' retention of the benefits be unjust. *See Lightfoot v. Union Carbide*

*Corp.*, 110 F.3d 898, 905 (2d Cir.1997). This Court has previously determined that defendants' use of their mark is proper. As there is no evidence in the record supporting the contention that defendants were unjustly enriched at plaintiff's expense, plaintiff has failed to show a likelihood of success on the merits of this claim.

### (3) *Trademark Dilution Claim under § 43(c) of the Lanham Act*

Plaintiff also seeks injunctive relief for the alleged dilution of its marks in violation of the Lanham Act. *See* Plaintiff's Memorandum at 24–27; Tr. at 15. Section 43(c) of the Lanham Act, also known as the Federal Trademark Dilution Act ("FTDA"), provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark. . . .

15 U.S.C. § 1125(c)(1). Dilution refers to "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception." 15 U.S.C. § 1127.

 The Second Circuit has set forth the five statutory elements essential to a claim of dilution: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior mark must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir.1999). While the *Nabisco* Court declined to adopt a list of factors as a "fixed test for dilution" (*id.* at 227), the Court clearly stated that distinctiveness and fame are requisite elements, each of which

**218**

must be proven. *Id.* at 215–16. Plaintiff herein must meet the "rigorous criteria . . . requiring both fame and distinctiveness for protection under the FTDA." *Sporty's Farm L.L.C.*, 202 F.3d at 497, n. 10.

■■■ Distinctiveness, in the Second Circuit's interpretation, is a statutory element separate and apart from fame and refers to the inherent qualities of a mark. "There can be no dilution of a mark's distinctive quality unless the mark is distinctive." *Nabisco, Inc.*, 191 F.3d at 216. More recently, the Second Circuit reiterated that a senior mark is "not entitled to protection at all if it is not distinctive" (*Federal Express Corp.*, 201 F.3d at 176) and that "[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir.1989). *See Eric Louis Associates, Inc.*, 79 F.Supp.2d at 342 (determination whether a mark has acquired secondary meaning is tantamount to determination of its distinctiveness). Accordingly, the question of whether plaintiff's marks here are distinctive under the FTDA is considered, not in a vacuum, but may be analogized to the earlier strength of mark analysis conducted in connection with plaintiff's trademark infringement claim herein.

■■■ A descriptive mark has "little distinctiveness" and is ineligible for protection unless it has acquired secondary meaning. *Nabisco, Inc.*, 191 F.3d at 215. This Court has determined above that BigStar's marks have no truly distinctive qualities and that plaintiff has not adequately demonstrated that its marks have acquired sufficient secondary meaning to entitle it to the protection sought in this action. Plaintiff's marks are not registered and face the possibility of opposition to registration. The marks are weak; they are comprised of ordinary words, the combination of which entails little imagination to compose. Proof of the lack of inherent distinctiveness is further apparent from the identical and similar "Big Star" trademarks found in federal and state registries which have been and continue to be used by myriad businesses, including some in the market of selling film videocassettes that is plaintiff's primary business. Because plaintiff's marks are not distinctive and lack secondary meaning, the Court finds that plaintiff cannot establish at this time that it can satisfy this statutory element and thus that plaintiff is not likely to succeed on the merits of its dilution claim.

By the same token, the lack of distinction of BigStar's marks, combined with the relatively brief time they have been used for plaintiff's commercial ventures; the absence of proof of relative success in achieving recognition and secondary meaning from capital expended to promote the marks; the existence of numerous other similar commercial names; and the absence in this record of any consumer surveys documenting the extent of actual public identification of plaintiff's marks, all render it unlikely that plaintiff would succeed in establishing that its marks have crossed the threshold of recognition to be regarded as famous.

**(4)** *Claim under the New York Dilution Statute*

BigStar suggests that the elements of its federal dilution claim are "more rigorous than the pendant state claim," declining to address the state claim because "likely success on the federal claim implies likely success on the state claim." Plaintiff's Memorandum at 24, n. 9.

■■■ New York's dilution statute, codified in the new section 360–*l* of the New York General Business Law, protects "only extremely strong marks." *Sally Gee, Inc.*, 699 F.2d at 625 (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 545–46, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977)). In this case, as found above, plaintiff's marks are at best merely descriptive, not inherently distinctive, and there is insufficient

evidence that they have acquired secondary meaning due to, among other things, extensive third party use. They are not "extremely strong" marks. Accordingly, this Court concludes that plaintiff is unlikely at this time to succeed on the merits of its state dilution claim.

### B. Balance Of Hardships *Decidedly* In Plaintiff's Favor

In the absence of proof of likelihood of success on the merits, in order to establish eligibility for injunctive relief, plaintiff must prove that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in its favor. As discussed previously, plaintiff's unregistered marks are composed of common, descriptive words; numerous third parties are using or have registered "Big Star" (Koonce Aff., Ex. C); other businesses, some in plaintiff's own industry, have been using "Big Star" as a mark without BigStar's awareness of their existence. *See* Tr. at 37. Moreover, at the time plaintiff filed this application, defendants had announced the promotional 40–city bus tour they were to embark upon in March 2000 to generate publicity for Next Big Star's talent search. Defendants have also engaged in a promotional campaign using the very phrase set forth in their mark. *See* n. 14, *supra.* For these reasons alone, this Court finds that the grant of an injunction would create far greater hardships for defendants than plaintiff would suffer in the absence of such extraordinary relief. Based on the present record, this Court concludes that plaintiff has failed to show that the balance of hardships tips decidedly or sharply in its favor.

### C. Irreparable Harm

It is axiomatic that a preliminary injunction will not issue unless the movant establishes that imminent and irreparable harm would result if injunctive relief were denied. In this action, the Court need not address this factor extensively, having found on the present record neither likelihood of success on the merits of plaintiff's five claims nor a balancing of hardships tipping decidedly in plaintiff's favor. The Court nevertheless offers three observations. First, not having registered marks, plaintiff is not entitled to a presumption of irreparable harm where it has not proven a likelihood of confusion. Second, plaintiff's counsel did not rule out the possibility that plaintiff could be redressed through a monetary award for damages suffered. *See* Tr. at 21–22. Finally, in response to this Court's questions, plaintiff's counsel could not offer proof that plaintiff's sales had declined because of defendants' operation (Tr. at 18); that any of plaintiff's activities, relationships or agreements had been affected by defendants' activities (Tr. at 18–19); that the number of hits at plaintiff's website or the use of its information services had been impacted by defendants' business (Tr. at 19); or that plaintiff's publicly traded stock had been affected as a result of defendants' conduct (Tr. at 21). These considerations are instructive in any case where a movant alleges that in the absence of an injunction it may suffer irreparable harm. Admittedly, these question were posed to plaintiff at the commencement of the action shortly after plaintiff alleges it became aware of defendants' venture. Nonetheless, the absence of this type of evidentiary record reinforces the prematurity of granting injunctive relief at this stage of the proceedings.

### III. CONCLUSION

Plaintiff has not met its burden of proving that it is entitled to a preliminary injunction under the facts and applicable law pertaining to this matter. The parties are directed to appear at a conference with the Court on April 26, 2000 at 3:30 p.m. during which a Case Management Plan will be adopted to guide further pretrial proceedings concerning this action.

### IV. ORDER

For the reasons set forth in the foregoing Decision, it is hereby

**ORDERED** that plaintiff BigStar Entertainment's application for a preliminary injunction filed with this Court on February 7, 2000 be and hereby is denied.

**SO ORDERED.**